UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **LENNY LORRAINE JAMES,** | § | |
| Plaintiff | § | |
| V. | § | CIVIL ACTION NO. C-05-257 |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Lenny Lorraine James filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security ("Commissioner") for the purpose of receiving Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Plaintiff filed a brief in support of her original complaint on October 7, 2005 which is construed as a motion for summary judgment and defendant filed a motion for summary judgment and supporting brief on November 3, 2005 (D.E. 10, 11, 12).

## BACKGROUND

Plaintiff filed her applications on September 3, 2002 and they were denied at all administrative levels (Tr. 380-382, 384-389, 392-394, 23-29, 31-33, 11-20, 4-6). Plaintiff alleges an inability to work since April 15, 2000 because of chronic low back pain, discogenic and degenerative disorders of the back, osteoarthritis and allied disorders (Tr. 21-22, 69). Her symptoms include constant pain in her lower and middle back and left hip and numbness in her left leg (Tr. 57). Plaintiff was 50 years old at the time of the hearing (Tr. 47, 397). Prior to becoming disabled she worked as a meat slicer in a restaurant and as a counter salesperson in a building supply store (Tr. 79-80).

**MEDICAL EVIDENCE**

In June 2001 plaintiff complained of abdominal and back pain after having fallen down some stairs three days previously. She was diagnosed with abdominal pain, lumbar strain and GERD (Tr. 103). An X-ray taken on July 12, 2001 showed a mild degree of scoliosis with convexity to the left. The vertebral bodies' height and disc spaces were well-preserved and the pedicles, interpedicular distance and posterior elements were unremarkable (Tr. 106). She continued to complain of lumbar pain in July and August 2001 with increasing paravertebral spasms and pain radiating down her left leg (Tr. 107-109).

On September 12, 2002 Blanca Gray, M.D., stated that she had been treating plaintiff for a back injury and that plaintiff was unable to return to work because she was unable to lift more than five pounds or stand longer than one-half hour (Tr. 123). An X-ray on September 20, 2002 showed small to moderate left eccentric L5-S1 disc protrusion, which barely touched the left S1 nerve root although it caused moderate left foraminal narrowing (Tr. 125). A lumbar spine X-ray was normal (Tr. 126).

Plaintiff saw Rob Williams, M.D., on October 23, 2002 complaining of severe lower back pain. She reported aching back pain for the previous two years after having fallen from a flight of stairs. She also had bilateral leg numbness and was unable to sleep. She had no bowel or bladder dysfunction. Her examination was normal, except for midline and paraspinous tenderness to palpation. She had bilateral greater trochanteric tenderness and left sciatic notch tenderness. She had lumbar forward flexion to six inches from toe touch, extension to 20 degrees and right lateral bending to 20 degrees. She was able to heel and toe walk and her lower extremity motor strength was 5/5. Her neurological examination was normal except for the

seated right leg raise, which reproduced pain in her back on each side.  She was diagnosed with L5/S1 left central nerve protrusion/HNP.  Dr. Williams recommended a Medrol dose pack followed by Celebrex and Lortab and also the McKenzie program with modalities.  In addition, plaintiff was referred to Dr. Eric Dubois for pain management (Tr. 127-129).

Plaintiff underwent a consultative internal medicine examination performed by Nadia Nooruddin, M.D., on November 13, 2002.  Plaintiff told Dr. Nooruddin that she had attended two years of college and had done bookkeeping work, but had stopped in April 1999 after she gained custody of her granddaughter.  She reported smoking a pack of cigarettes a day.  Her chief complaint was a lower back and hip injury and she had rheumatoid arthritis (Tr. 133).

Plaintiff reported that her back and hip pain started after she fell down a flight of stairs.  The back pain went down both legs, but more so on the left, which sometimes became numb.  She also had pain and stiffness in her hands and was unable to twist open jars.  She reported that she could not vacuum and could not lift more than five pounds.  She had to hold onto someone or something when walking because of generalized aches and pains as well as the back pain.  She also complained of urinary stress incontinence (Id.).

Upon physical examination, she could not do the straight leg raise, especially on the left side, because of pain and she did not allow any active or passive movement of that hip because of pain.  She also complained of bilateral shoulder pain with restriction of abduction movement of 90 degrees.  Her elbows felt sore but she had good range of motion there.  There was evidence of early osteoarthritic joint disease in the interphalangeal joint with good range of motion at the wrist associated with pain.  Plaintiff could not cooperate with the neurological examination because of aches and pains all over her body.  But there was no evidence of any focal, motor or

neurological deficits and her deep tendon reflexes were equal bilaterally.  The plantars were down-going and her cranial nerves 2-12 were intact.  A left hip X-ray was normal as was a lumbosacral spinal X-ray, except for minimal scoliosis which may have been positional (Tr. 131-132).  Dr. Nooruddin's assessment was chronic low back pain and hip pain status post trauma with history of chronic pain syndrome; osteoarthritis/rheumatoid arthritis in peripheral joints by history, a history of urinary stress/urge incontinence and chronic pain syndrome (Tr. 131).

On February 7, 2003 Dr. Gray completed a medical assessment form at the request of plaintiff's representative.  Dr. Gray noted that plaintiff could not lift more than 10 pounds, could stand less than two hours in an eight-hour work day, could sit less than two hours, could sit or stand for only five minutes before needing to change positions and would need to walk around every five minutes for five minutes at a time.  In addition, Dr. Gray thought plaintiff would need to be able to shift at will from sitting to standing and would need to sit down at unpredictable intervals during her work shift every three or four hours.  Dr. Gray attributed plaintiff's limitations to her disc herniation at L5-S1 with moderate foraminal narrowing.  In addition, Dr. Gray said plaintiff should never twist, stoop, crouch or climb stairs or ladders and noted that her ability to reach, handle, push and pull were affected by her back impairment.  Dr. Gray noted no limitations in plaintiff's abilities to work in environmental extremes, but thought she should refrain from working around hazardous machinery and heights because her disc herniation caused her to be unable to climb and caused lower extremity instability (Tr. 154-156).

Plaintiff saw John M. Borkowski, M.D., at Orthopaedic Associates of Corpus Christi on February 19, 2003.  She was taking Celebrex, Lortab, Darvocet and heat treatments for her low back pain, but said her condition was becoming worse.  She appeared to be in distress because of

her back pain and was sitting in a chair with her left side elevated.  Standing and walking caused severe paraspinal spasms in her back to palpation.  She had a positive straight leg raise on the right.  Her reflexes were preserved but her sensation was decreased in the S1 distribution on motor exam.  An MRI of plaintiff's lumbosacral spine performed on February 27, 2003 showed left lateral disc protrusion at the L5-S1 level with mild mass effect on the exiting left S1 nerve root.  The also was evidence of left neural foramen narrowing at the level (Tr. 162).

Plaintiff saw Thomas W. Edwards, M.D., at the South Texas Pain Management Center on March 5, 2003 (Tr. 148).  Plaintiff reported that her back pain was incapacitating and that it arose at the lumbosacral junction and radiated into her left buttock and posteriorly down the left lower extremity to her foot with associated numbness and tingling in her foot.  She denied bowel and bladder dysfunction.  Her pain was increased by walking, prolonged standing or sitting in one position and most upright twisting movements.  She had found no medication which relieved her pain without limiting side effects.  The straight leg raising test was negative on the right but on the left she developed radicular left lower extremity pain with just a few degrees of elevation in the sitting position.  There was also significant left-sided sciatic notch tenderness.  Her cranial nerves 2-12 were grossly intact and her deep tendon reflexes were 2+, being equal at the knees and the right ankle, but slightly decreased at the left ankle.  She had good motor strength in all extremities.

Dr. Edwards assessed plaintiff with a herniated nucleus pulposus and lumbosacral radiculitis.  He recommended a lumbar epidural steroid injection under fluoroscopy (Tr. 147-148).  The procedure was done, but plaintiff reported only a few hours of reduced pain and overall she did not respond well to the treatment (Tr. 149).

On May 29, 2003 plaintiff underwent a decompressive laminectomy, decompressive foraminotomies bilaterally and diskectomy. She also received an interbody spacer, pedicle screws Synthes, bone graft, allograft and AGF factor (Tr. 183-185). Three weeks after the surgery plaintiff was doing well with no leg pain but she had some surgical pain around the incision. No complications were noted (Tr. 193).

After a week of physical therapy, plaintiff was evaluated on July 10, 2003 and reported that she was doing great and had no back pain. She was walking without any onset of pain and was anxious to have her restrictions lifted (Tr. 300-301). On July 28, 2003 plaintiff reported her pain at a 1-2 on a scale of 1-10. She had increased range of motion, increased strength and normal gait pattern. She still was unable to resume functional and leisurely activities of daily living without lumbar spine pain 100 percent of the time (Tr. 302).

In January 2004 plaintiff saw Dr. Borkowski because she had sacroiliitis that was affecting her gait and causing pain and radiculopathy (Tr. 348). An MRI showed no compressive disease and no misplacement of equipment but did show small annular tears above her fusion. Dr. Borkowski concluded that her pain was mainly sacroiliitis and he injected the sacroiliac joint under fluoroscopy guidance. On March 29, 2004 plaintiff reported that the injection relieved her pain and her neurological exam was within normal limits. Dr. Borkowski stated that he supported her application for disability benefits because if she returned to work full time the annular tears could flare up and cause her some pain in the future, which would require another fusion for a transfer lesion (Tr. 314, 348-350).

On June 17, 2004 at the request of plaintiff's attorney, Dr. Borkowski filled out an assessment of plaintiff's ability to do work-related activities. He stated that she was limited to

lifting less than 10 pounds and could stand and sit for less than two hours at a time. She could sit for only 15 minutes before having to change positions and could stand for only five minutes before having to change positions. She would need to walk around every 20 minutes for five minutes at a time and would need to be able to stand and sit at will. She would need to be able to lie down at unpredictable intervals during the day. This analysis was based on plaintiff's MRI which showed annular tears and also on her sacroiliitis, numbness and tingling down her arm, cervicalgia, degenerative discs and brachialgia. Dr. Borkowski stated that plaintiff could occasionally twist, but could never stoop, crouch or climb stairs or ladders. Also, her abilities to reach, handle, finger and feel were affected by her impairment. He found that she had no environmental limitations, but should not work around hazards because she takes pain medication. He thought that her impairments or treatments would cause her to be absent from work more than three times per month (Tr. 372-374).

## HEARING TESTIMONY

At the hearing held June 22, 2004 plaintiff testified that she can no longer work as a bookkeeper because she cannot sit long enough to work at a computer or to do any typing or filing because her back starts to cramp. She cannot work as a barbeque slicer because she cannot lift her arm at all or lift anything as heavy as a gallon of milk (Tr. 400-401). She cannot lift more than five pounds and she would have to pick even that much weight up from a counter. She was 51 and had a GED plus two years of college. She could read and write and make change (Tr. 401). Plaintiff cannot work as a telephone solicitor because she cannot sit for long periods of time and she cannot work long hours (Tr. 401-402).

When she is at home she sits in a swing and when she becomes tired of sitting, she has to stand up and walk a little ways and sit back down (Tr. 402-403). Her husband helps her bathe and when he is not home she wears a gown. If she becomes hungry while he is at work, she keeps a little box of milk in the refrigerator. When she is alone in the house she takes medication and lies down. Sometimes she makes a peanut butter sandwich (Tr. 403).

Dr. Borkowski is treating her for back and leg problems and has been giving her injections in both hips. She also receives injections in her back and is beginning to receive neck and arm injections. Dr. Borkowski prescribed a cane for plaintiff to use because she lost her balance in his office and that is when he discovered she had bursitis in her hips (Tr. 404). The injections relieve her pain so that she can walk, but her big problem is the "tearing off" of the surgery. The doctor has told her that if she lifts or pulls something or if she bends over and lifts something the wrong way it could continue to tear. If it does continue to tear, she may need additional surgery (Tr. 405-406). Sometimes the injections really help with the pain for a week or two and sometimes they do not (Tr. 406-407).

Plaintiff also has problems with bladder control. She was examined by a urologist who told her that her bladder had fallen and that she could have surgery to tack it back up. She urinates when she coughs or walks (Tr. 407). She can reach with her right arm but she cannot lift it past her shoulder (Tr. 407-408).

The Soma medication she takes allows her to stay focused. The Neurontin and the patch that she wears cause her to be very sleepy so she takes them only at night. She cares for her eight-year-old granddaughter and needs to stay awake during the day (Tr. 408). Even so, she has a hard time concentrating (Tr. 409). She is sometimes able to shower by herself but her husband

helps her wash her hair and get dressed.  She wears slip-on shoes (Tr. 408-409).  Her husband buys groceries, does the laundry, cooks and cleans house (Tr. 409).

She usually sleeps just three or four hours per night even though she takes Ambien.  When her granddaughter goes to school, plaintiff goes back to bed.  She takes anti-depressants but cannot afford to see a mental health professional (Tr. 410).  She was diagnosed with rheumatoid arthritis years earlier and her hands and feet are beginning to curl.  She used to love to sew and do needlework, but is no longer able to do so.  She also is no longer able to participate in any outdoor activities like fishing or swimming (Tr. 410-411).

The medical expert ("ME") summarized plaintiff's medical history (Tr. 413-419).  He did not think that plaintiff's impairment met or equaled a listed impairment.  He evaluated her under 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(a) but did not think she met that listing because there was no evidence of radiculopathy.  He did not evaluate her under any other listing and did not have any evidence of any shoulder impairment so was not able to evaluate that (Tr. 419).  Prior to surgery, he thought she would have had the residual functional capacity to do work at the light level.  He did not understand Dr. Borkowski's latest residual functional capacity evaluation because two months prior he had said she was pain free and walking (Tr. 420).  If she had recently received an injection it would have made walking easier (Tr. 420-421).

Although plaintiff cares for her granddaughter, the girl bathes and dresses herself.  Plaintiff keeps frozen dinners and snacks that the child prepares for herself.  Plaintiff does not have to lift her up to do anything.  When the girl was younger, plaintiff's husband lifted her out of the bathtub and did any other required lifting (Tr. 433-435).

9

The vocational expert ("VE") testified that plaintiff's job as a slicer is light and semi-skilled, although she described it as being at the medium to light level. Her work as a counter clerk was light and semi-skilled and her work as a bookkeeper was sedentary and semi-skilled (Tr. 436). The ALJ described a hypothetical person who was 50 years old, had the same education level as plaintiff and could do a full range of light work. She would need to avoid stooping and crouching but had no loss of manual dexterity. The VE testified that such a person could go back to her previous jobs as a counter clerk, counter sales person or bookkeeper (Tr. 438).

If the hypothetical person missed work three times per month, she would have a hard time sustaining employment because most employers will not tolerate that many absences. If the person had the maximum capacity to stand and walk less than two hours per day and sit for less than two hours per day, she would not be able to sustain full time employment (Tr. 439).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The burden has been described as more than a scintilla, but lower than a preponderance. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995). A finding of "no substantial evidence" occurs "only

where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir. 1988)(citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. Martinez v. Chater, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

## DISCUSSION

The ALJ found that plaintiff had not engaged in substantial gainful work activity since her onset date. He found that she had disorders of the back and osteoarthritis, both of which are

considered "severe," but not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found that plaintiff has the residual functional capacity ("RFC") to do light work with the additional limitations of less than occasional stooping or crouching. The ALJ next concluded that plaintiff could return to her past relevant work as a counter clerk or bookkeeper and accordingly determined that she is not disabled (Tr. 14-20).

Plaintiff asserts that the Commissioner's determination that plaintiff is not disabled is not supported by the evidence. In particular, plaintiff argues that the ALJ failed to properly give controlling weight to the treating physician's medical opinion.

## A. Insurance Period

As an initial matter, plaintiff argues that the record of her impairments prior to May 29, 2003 (the date of her back surgery) are of little concern because the purpose of the operation was to correct the impairments observed before the operation (Pl's brief, D.E. 10, p. 14). However, for purposes of DIB, plaintiff's insured status expired on September 30, 2001 (D.E. 15, 52). To be eligible for DIB, she would have to establish that she was disabled prior to September 30, 2001. See generally 20 C.F.R. §§ 404.101 through 404.146. If plaintiff were to establish that she was disabled after that date, she would be entitled to SSI benefits, provided all of the other requirements were met. See generally 20 C.F.R. §§ 416.202, 416.335, 416.501.

## B. Treating Physician's Opinion

Plaintiff argues that the ALJ failed to properly credit the opinions of her treating physicians regarding her RFC. Dr. Borkowski assessed plaintiff as having the RFC to do less than sedentary work and also said that her impairments would cause her to miss more than three

days of work per month. Had the ALJ given Dr. Borkowski's opinion controlling weight, he would have found plaintiff disabled. Instead, the ALJ found that plaintiff can do light work[1].

Under the regulations, the Commissioner is supposed to give more weight to opinions from treating sources because they are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of a plaintiff's impairments and might bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If the treating physician's opinion on the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the Commissioner is supposed to give it controlling weight. If he does not give it controlling weight, he is supposed to look at the length, nature and extent of the treating relationship, the frequency of examination, the support provided by other evidence, the consistency of the opinion with the record as a whole and the specialization of the treating physician. 20 C.F.R. § 404.1527(d).

The ALJ can decrease reliance on treating physician testimony for good cause, which includes statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques or otherwise unsupported by evidence. Leggett v. Chater, 67

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567.

F.3d 558, 566 (5th Cir. 1995)(citations omitted).  However, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating physician, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's view under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).  Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000)(emphasis in original).  Also, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

In this case, the ALJ found that the medical record did not support Dr. Borkowski's findings regarding plaintiff's physical limitations (Tr. 17).  The ALJ notes that after plaintiff's back surgery, an MRI showed no evidence of compression disease (Tr. 18, 347, 349).  A clinic note indicated that plaintiff was pain free and walking and had a negative neurological examination (Tr. 18, 350).  The ALJ further noted that the file contained no good evidence of radiculopathy (Tr 18).  The ALJ concluded that because the record did not contain medical evidence to support Dr. Borkowski's or Dr. Gray's diagnoses of plaintiff, he would give more weight to the ME's opinion regarding plaintiff's limitations.

A careful review of the medical evidence after plaintiff's back surgery shows that the ALJ is correct.  The only post-surgery objective medical evidence in the record which supports Dr. Borkowski's limitations was the MRI in January 2004 which showed small annular tears without evidence of disc herniation or central spinal stenosis and facet arthropathy in the lumbar spine without evidence of foraminal stenosis (Tr. 347, 349-350, 355).  In fact, in the clinical note

of March 29, 2004, Dr. Borkowski stated that he supported plaintiff's application for disability because he thought if she returned to work the tears *might* flare up and cause her some pain in the future. As of that day though, she was pain free and walking and had a normal neurological exam (Tr. 350).

Although mindful of the fact that if plaintiff returns to work she could re-injure her back, at this time she does not appear to be disabled according to the Social Security regulations, which require that a disability be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Although there was evidence to support her reports of pain in the months immediately prior to her back surgery, there is no evidence after the surgery to support her complaints of disabling pain or Dr. Borkowski's limitations. Accordingly, the ALJ's determination that plaintiff is not disabled should be affirmed and summary judgment should be entered for defendant.

## RECOMMENDATION

For the reasons stated above, it is respectfully recommended that plaintiff's brief in support of her complaint, treated as a motion for summary judgment (D.E. 10), be denied. It is further recommended that the defendant's motion for summary judgment (D.E. 11) be granted and that the Commissioner's determination that plaintiff is not disabled be affirmed.

Respectfully submitted this 13th day of January, 2006.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).